# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**ELADIO PICON-GONZALEZ,**
    Petitioner,

    v.

**COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION,**
    Defendant.

Civil No. 18-1016 (BJM)

## OPINION AND ORDER

Eladio Picon-Gonzalez ("Picon") moves to reverse the Commissioner of the Social Security Administration's ("the SSA's") decision to redetermine and terminate his Social Security Disability Insurance benefits following a referral from the Office of the Inspector General ("OIG"). Dkt. 21. The SSA defended its decision, Dkt. 22, and Picon replied. Dkt. 23. The case is before me on consent of the parties. Dkts. 7, 10.

For the following reasons, the Commissioner's decision is **REMANDED** for proceedings consistent with this ruling.

## STANDARD OF REVIEW

The court's review of Social Security disability cases is limited to determining whether the Commissioner and her delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Secretary of Health & Human Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Visiting Nurse Association Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court "must affirm the [Commissioner's]

resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Secretary of Health & Human Services*, 819 F.2d 1, 3 (1st Cir. 1987). After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

Generally, the Commissioner must employ a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Secretary of Health & Human Services*, 690 F.2d 5, 6–7 (1st Cir. 1982). In step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to the fourth step, through which the Administrative Law Judge ("ALJ") assesses the claimant's residual functional capacity

("RFC") and determines whether the impairments prevent the claimant from doing the work he has performed in the past. An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant is able to perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final step asks whether the claimant is able to perform other work available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Santiago v. Secretary of Health & Human Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Secretary of Health & Human Services*, 890 F.2d 520, 524 (1st Cir. 1989). Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Secretary of Health & Human Services*, 818 F.2d 96, 97 (1st Cir. 1986).

Rather than reviewing an initial determination, the petitioner here appeals a redetermination. "The Commissioner of Social Security shall immediately redetermine the entitlement of individuals to monthly insurance benefits under this subchapter if there is reason to believe that fraud or similar fault was involved in the application of the individual for such benefits." 42 U.S.C. § 405(u)(1)(A). The SSA may have reason to believe fraud or similar fault occurred through its own investigations or through referral of an investigation by the OIG. *See, e.g.*, 42 U.S.C. § 1320a-8(*l*). "Similar fault" occurs when either "an incorrect or incomplete statement that is material to the determination is knowingly made" or "information that is material to the determination is knowingly concealed." *Id.* at § 405(u)(2). "When redetermining the entitlement, or making an initial determination of entitlement, of an individual under this subchapter, the Commissioner of Social Security shall disregard any evidence if there is reason to

believe that fraud or similar fault was involved in the providing of such evidence." 42 U.S.C. at §
405(u)(1)(B).

The Appeals Council, which issues the final administrative determination on social security
cases, defines its procedures and guiding principles in the Hearings, Appeals and Litigation Law
manual ("HALLEX"). [1] HALLEX does not provide substantive rules nor does it interpret statutes
as Social Security Rulings do, so it is not entitled to deference. It does, however, illustrate the
recommended approach ALJs and the Appeals Council take in redetermination cases. *See Moore
v. Apfel*, 216 F.3d 864, 869 (9th Cir. 2000) (declining to apply *Chevron* deference to HALLEX);
*but see Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786, 807 n.9 (6th Cir. 2018) (presuming HALLEX
guidelines were "interpretive rules" after the Social Security Administration so alleged); *see also
Taylor v. Berryhill*, Civ. No. 16-044, 2018 WL 1003755, at *16–17 (W.D. Va. Feb. 21, 2018)
(deferring to Social Security Rulings and noting HALLEX constitutes "distinct guidelines" for
redetermination procedures).

HALLEX states that a redetermination "based on fraud or similar fault is a re-adjudication
of the individual's application for benefits." HALLEX I-1-3-25 (updated Feb. 25, 2016). The ALJ
charged with redetermining a claim may consider evidence initially submitted as well as new,
material evidence that does not involve fraud or similar fault and is related to the period at issue.
HALLEX I-1-3-25(A). An ALJ generally decides "whether to disregard evidence based on
whether there is reason to believe similar fault was involved," but an ALJ assigned to redetermine
a claim may also be instructed to disregard certain evidence. HALLEX I-2-10-10(A), Note 1
(updated June 25, 2014). Evidence to be considered can be divided between initial evidence,
submitted for the original claim, and new evidence that a beneficiary may submit for the
redetermination. Pursuant to § 405(u)(2), the adjudicator *must* disregard any information from the
OIG referral which resulted in a finding of fraud or similar fault. *See* HALLEX I-1-3-25(C)(4)(a).
"[A]djudicators do not have discretion to reconsider the issue of whether the identified evidence

---

[1] HALLEX, the Hearings, Appeals and Litigation Law manual, can be located online at
https://www.ssa.gov/OP_Home/hallex/hallex.html.

should be disregarded when based on an OIG referral of information." *Id.*; *see also* SSR 16-1p, 2016 WL 931538 (March 14, 2016). Redeterminations based on SSA findings of fraud or similar fault, however, are treated differently and adjudicators retain discretion to consider the beneficiary's objection to disregarding certain evidence. *Id.*[2] A beneficiary may submit additional evidence if it is "new, material, and related to the time period at issue." *Id.* at I-1-3-25(C)(4)(c). The time period at issue, referred to by Picon as the "closed period," runs from the disability onset date through the date of the final benefits determination. *Id.* at I-1-3-25(C)(3). The onset date is the date determined by the SSA, rather than the date declared by the beneficiary on his initial application for benefits. "Evidence that post-dates the original determination or decision can relate to the period at issue if it is reasonably related to the time period originally adjudicated." *Id.* at I-1-3-25(C)(3)(c). The adjudicator then determines, based on the eligible evidence, whether the beneficiary was or was not entitled to benefits at the time of the original determination.

Should the Commissioner determine "that there is insufficient evidence to support such entitlement, the Commissioner of Social Security may terminate such entitlement and may treat benefits paid on the basis of such insufficient evidence as overpayments." 42 U.S.C. § 405(u)(3). The Commissioner may "require such overpaid person or his estate to refund the amount in excess of the correct amount." 42 U.S.C. § 404(a)(1)(A). Beneficiaries may seek a disability insurance waiver to avoid repayment of benefits later deemed to be overpayments. 42 U.S.C. § 404(b)(1) ("there shall be no adjustment of payments to, or recovery by the United States from, any person who is without fault if such adjustment or recovery . . . would be against equity and good conscience.").

## BACKGROUND

The following is a summary of the treatment record, consultative opinions, self-reported symptoms and limitations as contained in the Social Security transcript, and the case history.

---

[2] The Sixth Circuit held in *Hicks* that this distinct treatment of evidence based solely on the source of referral for redetermination violates the Due Process Clause of the Fifth Amendment. *Hicks*, 909 F.3d at 801–04.

Picon was born on January 5, 1950. Transcript ("Tr.") 943. He worked for Abbot Labs for nearly nineteen years as a purchasing section manager and later as a senior planner. Tr. 935, 943. Picon applied for disability insurance on October 27, 2009 and last met insured status requirements on December 31, 2012. Tr. 849–56, 943.

Picon claims to have been disabled since January 25, 2007 due to a spinal disorder which prevented him from bending, kneeling, walking, and using stairs. Tr. 564, 968. Picon testified that he left his job for medical reasons in 2007. Tr. 41. He engaged the help of a personal representative, Samuel Torres Crespo ("Torres"), with the insurance claims process. Tr. 588, 590. On March 15, 2010, the SSA found the submitted evidence supported a disability onset of July 1, 2008 and notified Picon by letter on March 27, 2010. Tr. 592, 594–98. That evidence included reports from Dr. Jose R. Hernandez Gonzalez ("Dr. Hernandez"), Dr. Luis Carlos Rojas Ruiz, Dr. Ramon I. Torrado Frias, and Campo Rico Psychiatric Center. Tr. 592. The SSA arrived at its decision because it found, "from all the evidence sources" in Picon's file, he suffered "significant functional limitations manifested in pain and limitation of movement." Tr. 592. Specifically, the SSA medical examiner found that Picon's spinal disorder met the criteria for disability benefits. Tr. 564.

Concurrently, an investigation into disability insurance cases in Puerto Rico was unfolding. In 2009, employees of the Puerto Rico Disability Determination Service warned the SSA that some doctors in Puerto Rico were submitting fraudulent medical evidence to the SSA in disability insurance benefit claims. Dkt. 22-1 ¶ 2 (Barry Decl.). The SSA referred the case to its OIG, which conducted the investigation with the assistance of the Department of Justice and the Federal Bureau of Investigation. *Id.*; Dkt. 22 at 4. On August 21, 2013, three doctors, non-attorney representative Torres, and seventy-one disability insurance applicants were indicted for fraud in connection with the OIG investigation. Barry Decl. at ¶ 3. Dr. Hernandez, the neurologist who submitted medical evidence in Picon's case, waived indictment and plead guilty to a conspiracy to make false statements to the SSA. *Id.* at ¶ 4. "Dr. Hernandez admitted that he would exaggerate medical complaints and symptoms in order to maximize the probability that his patients would be approved for Social Security disability insurance benefits." *Id.*; *see* Tr. 723–731. Torres also plead

guilty to, on two occasions in 2012, "having made a materially false, fictitious, and fraudulent statements and representation to the Social Security Administration." Tr. 741–50. Picon was not indicted, and he did not submit evidence from any of the other indicted doctors to support his claim.

The SSA began to review the nearly 7,000 cases containing evidence from Torres, Dr. Hernandez, and the other indicted doctors. Barry Decl. ¶ 5. A special team, the New York Fraud Prevention Unit ("FPU"), conducted the first round of redeterminations. *Id.* To redetermine a claim for disability insurance benefits, the FPU excluded evidence from those who had been criminally charged, including Dr. Hernandez. Then, the FPU determined whether sufficient evidence remained to support each beneficiary's benefits. The SSA preliminarily determined that about 2,000 beneficiaries could no longer support their benefit allowance without the disregarded evidence. *Id.* The SSA suspended these individuals' benefits, notified them of the redetermination process, and gave them ten days to submit additional evidence before continuing with its redetermination process. *Id.*

Dr. Arvind Chopra, a state medical consultant, reviewed Picon's case after discarding evidence from Dr. Hernandez and Torres. Tr. 570–74. Dr. Chopra preliminarily found that Picon was not disabled. *Id.* On January 10, 2014, Picon received notice that his benefits would be suspended pending redetermination because the SSA determined he had insufficient evidence to support his benefits allowance. Tr. 309; Dkt. 21 at 3; Dkt. 22 at 6. The SSA states that Picon did not submit additional evidence during the ten-day window in the redetermination process. Dkt. 22 at 6. Picon does not dispute this, asking rhetorically, "How can the plaintiff within 10 days answer an accusation of fraud, obtain and submit evidence for only the closed period?" Dkt. 23 at 7. The closed period to which Picon refers is July 1, 2008, the disability onset date, through March 15, 2010, when the SSA determined Picon was eligible for benefits. The SSA concluded, based on Chopra's opinion, that Picon was not disabled on July 1, 2008 and notified Picon that his claim had been denied. Tr. 303–05. The SSA terminated his benefits on January 27, 2014. Tr. 34. Picon requested reconsideration of the decision on February 21, 2014. This time, he submitted additional

evidence. *See* Tr. 1146–1916. Picon then appealed the denial before an Administrative Law Judge ("ALJ"). Picon appeared at the hearing on December 6, 2016 and testified, as did vocational expert ("VE") Timothy Shaner. Tr. 32–66; *see* Tr. 995.

The ALJ began his written decision by mentioning the OIG investigation into Dr. Hernandez and Torres and explaining what evidence he would disregard as a result. "By law, the undersigned may not consider: Any evidence submitted, supplied, or coursed by Mr. Torres dated from August 1, 2008 through September 26, 2014; [or] [a]ny evidence from Dr. Hernandez dated from August 1, 2008 through October 28, 2013." Tr. 16. The ALJ excluded Exhibit 1B (representative fee agreement), Exhibit 2B (appointment of non-attorney representative), and Exhibit 3E (disability report dated Dec. 4, 2009), which Torres submitted in October 2009. *Id*. The ALJ also excluded all of Exhibit 3F (Hernandez's treatment records) and a November 4, 2009, electromyography ("EMG") and nerve conduction study ("NCF") findings found in Exhibit 2F, 11F, and 13F, which Hernandez ordered and signed. *Id.* The ALJ specifically noted that Picon's redetermination arose from a referral from the OIG to the SSA in 2013. Tr. 17 n.3. The ALJ Hearing Decision in the case record additionally denotes Exhibit 1F as "disregarded," though the exhibit consists of two pages from imaging centers summarizing results from what appear to be MRIs performed in October 2008 and January 2009. Tr. 31; *see* Tr. 998–99. Dr. Hernandez's name appears on neither. Tr. 998–99.

The ALJ proceeded to consider the record "aside from the records from Mr. Torres; the records from Dr. Hernandez; and the many records from after March 15, 2010." Tr. 18. The ALJ gave "no weight" to the SSA consultants who relied on Dr. Hernandez's evidence, which he describes as "fraudulent." Tr. 26. Instead, he gave "great weight to the findings by the consultants reviewing the file before and after the suspension of the claimant's benefits." *Id.* (citing Ex. 2A, 3A). The remaining evidence from examining physicians, then, comes from Picon's general practitioner, Dr. Ramon Torrado-Frias ("Dr. Torrado"), his physiatrist, Dr. Maite Urquia ("Dr. Urquia"), and his psychiatrist, Dr. Luis Carlos Rojas Ruiz ("Dr. Rojas").

Picon filled out a function report on January 7, 2010 as part of his initial claim application. Ex. 4E. The report describes his daily activities and abilities in an effort to identify how his claimed disability limited his normal functioning. He suffered from sleep apnea, and lower back pain sometimes affected his ability to sleep. Tr. 968. He used a prescribed clamp/splint when sleeping to alleviate the pain. Tr. 973. Picon still kept a full daily routine. He did stretches in bed when he woke up, and he maintained personal hygiene by showering. His back pain affected his ability to use the bathroom "a little bit," but otherwise his personal care was "OK." Tr. 967–68. Picon ate three meals per day, which his wife normally prepared for him. Tr. 969. He stated that he ran errands to the grocery store, read magazines, watched TV, helped with chores, and even took trips in the car when he was able. Tr. 967. Picon helped with laundry a couple times per month, and no one prompted him to do so. Tr. 969. Picon denied any problems getting along with his family, friends, and neighbors. Tr. 972.

Picon stated, however, that his injury prevented him from "[b]ending, kneeling, walking, running, going up and down stairs." Tr. 968. He developed a fear "of bending or making quick movements." Tr. 973. Still, Picon left the house at least four or five times per week, walking, driving, or getting a ride in a car. Tr. 970. He listed "job/walk" as a hobby but stated that he couldn't do either very much and "sitting down is difficult at times." Tr. 971. This accords with his statement that dancing became "difficult" for him, and he no longer walked with his spouse or jogged. Tr. 972. Picon stated that he could walk between five and fifteen minutes before needing to rest for five to ten minutes. *Id.*

As part of the redetermination process, Picon submitted what appear to be a decade of progress notes from his primary physician, Dr. Torrado. Tr. 1305–61. Based on the length of their relationship, Dr. Torrado most likely gave Picon a referral for hearing specialists in August 2007, before the closed period. An audiogram revealed Picon's hearing to be normal through 2,000 Hz and that he had perfect word recognition scores. Ex. 11F at 325–329. Although Picon's hearing beyond 2,000 Hz had a moderate to severe impairment, a consultant reported that the results

indicated Picon could hear and speak in a work setting and his hearing loss was "non-severe." Tr. 580. Picon did not cite hearing loss as an issue in his function report or in his hearing testimony.

Dr. Torrado's progress reports from the closed period reveal semi-regular visits from September 10, 2008 through March 10, 2010. Tr. 1109–15, 1321. Dr. Torrado records on each of those eight visits that Picon suffered from sleep apnea and used a CPAP machine. *Id.* The rest of the progress notes are largely illegible, and the ALJ states that "there is no mention in them of anxiety, depression, or lower back pain." Tr. 24.

The function report focused almost exclusively on Picon's back pain, and records from his physiatrist, Dr. Urquia, indicate that he may have begun suffering from lower back pain about six months before an April 1, 2008 appointment with her. Tr. 1065. Dr. Urquia referred Picon for X-rays of his knees and back. Ex. 3F at 12–13. The X-ray showed he suffered from osteoarthritis, especially in the right knee. Tr. 1087. The findings indicated facet joint hypertrophy at L4-L5 and L5-S1 in March 2008. Tr. 1086. April 2008 progress notes from Dr. Urquia record Picon's back pain as being worst in the morning. Tr. 377. A month later, Dr. Urquia recorded that Picon's pain was intermittent, and he had full movement in his lower back. Tr. 374. The back pain continued but diminished with injections in June 2008, and Picon was able to move his legs fully. Tr. 372. Dr. Urquia recorded no sign of muscle atrophy. *Id.*

A subsequent MRI on October 8, 2008 indicated a disk bulge at L5-S1 as well as another bulge "with mild degenerative disk disease evident . . . and mild facet arthrosis." Tr. 1088. The MRI findings are in Exhibit 3F, on a page explicitly not disregarded by the ALJ on redetermination. *See* Tr. 37. A consulting internist reviewed that MRI finding. Ex. 10F. He concludes, "Based on this, which is the earliest evidence I found of a disorder of the spine, it is reasonable to establish an onset 3 months earlier to that date." Tr. 1145. The consultant also depended, however, on evidence submitted by Dr. Hernandez which supported sensory loss, atrophy, and muscle weakness. Ex. 9F. Neither Dr. Urquia nor Dr. Torrado made such diagnoses, so the MRI evidence must stand alone. Dr. Urquia continued treating Picon for physical pains, and he reported minimal back pain in October 2008, and an injection given at the same time reduced his pain for the next

two months. Tr. 368, 370. Another MRI, in November 2009, showed a herniated intervertebral disk at L4-L5 and L5-S1 levels. Tr. 1097. Prior to that MRI, however, Picon reported thigh and lower back pain which responded well to Dr. Urquia's physical therapy treatments and were not treated with further injections. Tr. 348, 350, 352. Picon suffered from osteoarthritis in his knees, which was responsive to injections and drugs Dr. Urquia prescribed. Tr. 335, 333. Between the onset of pain in January 2009 and the medicine, he reported "significant improvement" in June of 2009. Tr. 356. Ultimately, Picon underwent surgery on his back and knee after the closed period. Tr. 47, 55–56.

Dr. Urquia also treated Picon for trigger thumb on his dominant, right hand through injections and physical therapy. Tr. 1067–74. Picon marked that he had difficulty "using [his] hands" on the function report checklist and qualified his checkmark in the margin, writing "at times." Tr. 972. The hand pain recurred in 2008 but was treated once more. Tr. 1067. Dr. Urquia also diagnosed Picon with "right clinical CTS" or carpal tunnel syndrome, but no other doctor, aside from the disregarded Dr. Hernandez and the psychiatrist Dr. Rojas, diagnosed him. *See* Tr. 19. In his function report, Picon did not complain of any limitations caused specifically by CTS, and he stated that he drove his car. Tr. 970. At the hearing, Picon testified that he had CTS, which made using a screwdriver difficult but did not prevent him from helping to do the dishes or occasionally cooking. Tr. 49–50.

Picon first visited Dr. Rojas in November 2009. Tr. 1098. In a mostly illegible report, from January 18, 2010, Dr. Rojas described the first interview. *See* Ex. 4F. He noted "forgetfulness, nervousness" as a complaint or finding. Tr. 1103, 1105. Dr. Rojas described Picon as cooperative, logical, coherent but marked that "[a]ttention and concentration decreased." Tr. 1104–05. According to Dr. Rojas, Picon's intellectual functions and domestic skills also diminished. Tr. 1105. Dr. Rojas diagnosed Picon in January 2010 with major depressive order, recurrent, moderate and gave a prognosis of "reserved" on the basis of their two appointments together. Tr. 1107, 19. Dr. Rojas's appointment notes from January 12, 2010, however, contradict his summary. *Compare* Ex. 4F at 2–3 *with* Ex. 11F at 142). Dr. Rojas, as the ALJ interpreted the scrawled, Spanish-

language notes, wrote that Picon interacted well with his family and performed household chores. Tr. 1287. This is inconsistent with the report's description of Picon as "irritable" socially.[3] Tr. 1104. Picon ultimately visited Dr. Rojas ten times between November 2009 and February 2014; besides his psychiatrist, he did not visit a therapist or psychologist to talk about his mental state. Tr. 21 n.8; Tr. 48–49. According to Picon's testimony, his depression did not overly impact his daily life during the closed period. Tr. 49–53. Dr. Rojas assigned Picon a Global Assessment Functioning Score ("GAF") of 74, which indicates only mild limitations. Tr. 1284.

A consulting psychiatrist reached largely the same conclusion: Picon's depression did not rise to the level of severity required to be a disability. *See, e.g.*, Tr. 1129; Ex. 8F. In her own analysis of functional limitations, the psychiatrist rated as "mild" Picon's restriction of daily living activities, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. Tr. 1139. She found no extended episodes of decompensation. *Id.* Moreover, the psychiatrist did not believe his depression would last longer than twelve months. Tr. 1143. The ALJ credited her analysis, conducted in March 2010, and gave no weight to a different consultant, who disregarded Dr. Rojas's evidence entirely. Tr. at 1143, 20 n.6.

Picon also submitted evidence of his mental condition from Dr. Rojas for a time outside the closed period. A fifteen-minute follow-up appointment in April 2013 saw Picon in largely the same mental state as in 2009: Dr. Rojas finds him "logical, coherent, [and] relevant" but "depressed, anxious, irritable, [and] sad." Tr. 1277. Dr. Rojas again diagnosed him with a moderate form of major depressive disorder, recurrent. *Id.*

The VE identified Picon's first position at Abbot Labs as light and the second as sedentary both as categorized and as Picon performed them. Tr. 60. The ALJ asked the VE if a person with Picon's education, experience, and physical limitations could perform either of Picon's former

---

[3] The ALJ, citing to the Spanish-language report, found that the appointment notes contradict Dr. Rojas's report, which describes Picon's limited stress tolerance, antisocial behavior, and inability to do household chores independently. *See* Tr. 20. He also noticed a difference in diagnosis; the January report diagnoses Picon with moderate major depression "with anxiety," an addition that the appointment notes lacked. *Compare* Ex. 4F at 5 *with* Ex. 11F at 143; *see* Tr. 19 n.5.

jobs as a procurement services manager or as a senior manager. Tr. 61. The VE confirmed that Picon's former position as a procurement services manager would have been possible, but other jobs within the regional and national economy would have been unavailable because, in part, Picon's skills and expertise were strictly focused in his own industry. *See* Tr. 62. The ALJ asked a follow-up question, adding additional restrictions based on Picon's mental state, ability to use judgment and adapt to changes, and need for a slower work environment. Tr. 62–63. The VE stated that there were no jobs available in the national economy that fit the profile during the closed period. Tr. 63.

The ALJ ultimately found that Picon had not been disabled during the so-called "closed period." Tr. 9–31. The ALJ determined that the MRI and X-rays indicating "spinal cord compromise" were not enough to meet listing requirements without additional diagnoses of associated illnesses. Tr. 21–22. Dr. Hernandez provided the only additional diagnoses in this case, and the ALJ was required to disregard his evidence on redetermination. Tr. 22. Picon's ability to grocery shop during the period he claimed to be disabled undermined his ability to meet the criteria necessary for his spinal cord disorder to qualify as a disability. Tr. 22–23. The ALJ determined Picon, during the closed period, "had the residual functional capacity to lift, carry, push, pull up to 10 pounds occasionally, and lesser weights frequently; sit for a total of six hours a day; and stand and / or walk for a total of two hours a day." Tr. 23. The ALJ found Picon limited with regard to climbing, balancing, stopping, and exposure to slippery surfaces or hazards. *Id.* The ALJ observed Picon's work capacities to be greater than he claimed, and he noted that Picon's switch to a different, less exerting job was not reflected in the VE's categorization of the job or in Picon's description of it as requiring more driving. Tr. 24. The ALJ, though hampered by some illegible records, observed that Picon's pains were largely responsive to physical therapy, significantly improved by medication, and did not cause him constant pain. Tr. 25. The ALJ determined that, at no point during the closed period, was Picon disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 404.1520(f). He sequentially found that Picon:

(1) met the insured status requirements of the Social Security Act through December 31, 2012 (Tr. 18);

(2) did not work during the closed period (Tr. 18);

(3) during the closed period, "was significantly limited by the following severe impairments:" obesity, osteoarthritis of the knees, degenerative cervical disk disease, HNP at L4-L5 and L5-S1, mild degenerative lumbar disc disease and mild facet arthritis at L4-L5 resulting in bilateral recess stenosis and neural forminal stenosis, bilateral sacrolitis, hypertension, hyperlidimia, and mixed sensory motor peripheral neuropathy affecting the lower extremities (Tr. 18);

(4) did not have an impairment that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR §§ 404.1520(d), 404.1525, and 404.1526) (Tr. 21).

(5) during the closed period, had the RFC to lift, carry, push, pull up to 10 pounds occasionally and lesser weights frequently; sit for a total of six hours a day; and stand and / or walk for a total of two hours a day (Tr. 23);

(6) was capable, during the closed period, of performing his past work as a procurement services manager, which would not have exceeded his RFC (Tr. 26);

(7) was not disabled as defined by the Social Security Act at any time during the closed period (Tr. 26).

Picon asked the Appeals Council to review the ALJ's determination, and the Appeals Council denied his request on November 20, 2017. Tr. 1–5. Picon subsequently filed this complaint in federal district court for judicial review. Dkt. 1.

## DISCUSSION

Social Security Disability Insurance beneficiaries commonly ask the district courts to review the ALJ's decision to ensure that the ALJ properly considered and weighed the entirety of the evidence before her. Picon states in his complaint that substantial evidence does not support the ALJ's decision, and he makes further, unrelated arguments in his Memorandum of Law. Dkt.

1; Dkt. 21. Picon objects to the legal framework applied and procedural decisions made by the Commissioner and by the ALJ in the course of redetermining his benefits claim. Dkt. 21 at 2–3. Picon contests the statutory rules pertaining to fraud or similar fault, the mandated disregard of evidence, the use of a closed period, and the treatment of his benefits as an overpayment. Dkt. 21 at 2–3. The SSA defends its redetermination and states that it adhered to statutory and agency procedures. Dkt. 22 at 3. The SSA additionally contends that Picon's due process rights were not violated in the course of redetermination of his benefits. *Id.* at 16–20.

Picon's arguments can be divided into two rough categories: alleged errors committed by the ALJ in reaching his determination and the alleged constitutional violations in the law governing Social Security disability insurance benefits redeterminations, particularly with respect to the statutory mandate to disregard certain evidence. I will first address whether, excluding the "tainted" evidence as the statute requires, the Commissioner's decision was supported by substantial evidence, since, if not, there would be no need to reach the constitutional question Picon poses. *Cf. Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).

### *Sufficiency of the Evidence*

On redetermination, the ALJ disregarded the evidence from Torres and Dr. Hernandez pursuant to the Social Security Act. *See* 42 U.S.C. at § 405(u)(1)(B); HALLEX I-1-3-25(C)(4)(a). In particular, the ALJ's opinion notes that he may not consider Exhibit 13F, pages 58–60 and 97, which contained an EMG/NCS report ordered and signed by Dr. Hernandez. Tr. 16. Picon's attorney asked for clarification of the exclusion at the hearing and accepted the ALJ's decision that he was "only disregarding the evidence that is the EMGs." Tr. 37. Dr. Hernandez ordered the tests performed. Tr. 1836. Although a technician conducted those tests, *see* Tr. 1797–99, Dr. Hernandez interpreted them and made findings based on the data produced. As stated, § 405(u) requires Dr. Hernandez's submissions to be excluded during redetermination.

Picon contends that the ALJ improperly weighed evidence of CTS, hearing loss, obesity, osteoarthritis, sleep apnea, and depression when evaluating Picon's record. Dkt. 21 at 7–8. Dr.

Urquia diagnosed Picon with CTS, and Dr. Rojas jotted down "CTS" on one of his reports, but the ALJ discounted the psychiatrist's note as insufficient to be considered corroborating a medical diagnosis. Tr. 19. The ALJ weighed Dr. Urquia's diagnosis against her progress reports, which showed Picon's right thumb pain was responsive to physical therapy, which he attended regularly. Tr. 1067–74. Picon testified that using a screwdriver was difficult due to his hand pain, but he also stated that he was able to drive his car, do dishes, cook, and shop for groceries, all of which require using one's hand to apply force to objects. *See* Tr. 49–50, 970. Picon did not complain of further right thumb pain in seven follow-up visits to Dr. Urquia when she addressed his left trigger thumb in May 2008. Tr. 19. Picon had difficulty using his hands only "at times," and he did not complain of any work-related limitations caused by CTS in his function report. Tr. 972; *see generally* Ex. 4E. Picon did not mention CTS at the hearing until the ALJ specifically inquired into his ability to use his hands. Tr. 19, 49–50. The ALJ's decision not to find disabling CTS is supported by substantial evidence because the record does not support such a diagnosis.

Picon made even less mention of hearing loss in his function report. *See generally* Ex. 4E. Notably, he did not check the box to record any problems with "hearing" on the report. Tr. 972. An audiogram revealed Picon's hearing to be normal through 2,000 Hz and that he had perfect word recognition scores. Ex. 11F at 325–329. Although Picon's hearing beyond 2,000 Hz had a moderate to severe impairment, the ALJ credited a non-examining consultant's analysis that Picon could hear and speak in a work setting and his hearing loss was "non-severe." Tr. 19; *see also* Tr. 580. At step four of the ALJ's evaluation, he determined this hearing loss does not rise to the level of a disabilities because it has no impact on the claimant's ability to work. 20 C.F.R. § 404.1520(e).

Picon suffered from severe sleep apnea for years before the closed period. *See* Tr. 1280. After his May 2002 diagnosis, he sought treatment. During the closed period, Dr. Torrado's notes reflect that Picon used a CPAP machine to manage his sleep apnea. Tr. 1109–15, 1321. Picon contends that his sleep apnea made him sleepy during the day and contributed to his leaving his job. Dkt. 21 at 8. Picon, however, dealt with sleep apnea for seven years prior to leaving his job and he acquired the CPAP machine which, he affirmed, "[c]ertainly" helped him, before he quit.

Tr. 46. Again, Picon's tiredness at work was not sufficiently disabling to qualify as a disability within the meaning of the Social Security Act. *See* 20 C.F.R. § 404.1520(c). The ALJ noted that the CPAP machine effectively treated his sleep apnea, which is supported by a December 2008 study observing that the CPAP "restored normal sleep architecture." Tr. 1486. Thus, substantial evidence supported the ALJ's finding.

The ALJ also considered Picon's diagnosis of major depressive disorder, recurrent, moderate. *See* Tr. 19–21. He disregarded completely a consultant's report which ignored evidence submitted by Dr. Rojas; an appropriate response to a psychological consultant who simply ignores the claimant's treating psychiatrist. *See* Tr. 1143, 20 n.6. Another psychological consultant, whose finding received great weight, rated Picon's restrictions and limitations as mild. *See* Ex. 8F; Tr. 1139. Picon's function report accords with this finding—he could take care of his own hygiene, engaged himself watching television or doing Sudoku puzzles during the day, helped around the house, went to appointments and on errands, and spent time with friends and family a few times per month. Tr. 967–972. Picon said he dealt with his new routine and physical restrictions "[w]ith a lot of patience," and his fears concerned physical injuries related to his physical limitations. Tr. 973. Pion never sought a therapist, psychologist, or other professional with whom to talk about his life, fears, or mental state; he worked exclusively and infrequently with Dr. Rojas, a psychiatrist. Tr. 48–49; *see also* Tr. 21 n.8 (observing Picon saw Dr. Rojas only ten times between November 2009 and February 2014).

Picon's regular social activities and normal functioning accord with Dr. Rojas's assignment of a GAF score of 74. Tr. 1284. The high score matches the psychological consultant's analysis and evidence from the function report that Picon's depression was mild rather than disabling. That concordance also supports the ALJ's decision to give great weight to the consultant and lesser weight to Dr. Rojas's self-conflicting record. *See* Tr. 19 n.5, 21 n.8. Although some of Dr. Rojas's reports and his official diagnosis support a major depressive disorder, there is substantial evidence in the record from Dr. Rojas, from Picon, and from the consultant supporting the ALJ's finding of the existence of a mild, non-disabling form of depression.

Picon's back impairment provides the strongest case for a disability finding, but the exclusion of Dr. Hernandez's medical evidence prevents his impairment from qualifying as a disability pursuant to 20 C.F.R. Part 404, Subpart P, Appendix 1. Undisputed X-ray and MRI evidence demonstrates clear issues in Picon's lower back: facet joint hypertrophy at L4-L5 and L5-S1 in March 2008; two disk bulges, degenerative disk disease, and mild facet arthrosis in October 2008; and a herniated intervertebral disk at L4-L5 and L5-S1 levels in November 2009. Tr. 1086, 1088, 1097. "If you have an impairment(s) which meets the duration requirement and is listed in appendix 1 or is equal to a listed impairment(s), [the Commissioner] will find you disabled without considering your age, education, and work experience." 20 CFR § 404.1520(d). To meet the requirements of a listed impairment, the claimant "must have a medically determinable impairment(s) that satisfies *all* of the criteria in the listing." 20 CFR § 404.1525(d) (emphasis added). A disorder of the spine, like Picon's, is defined as "resulting in compromise of a nerve root (including the cauda equina) or the spinal cord" with evidence of something more. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04. The SSA initially determined Picon met Listing 1.04A, meaning his disorder of the spine was accompanied by "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." *Id.* at § 1.04A.

After Dr. Hernandez's evidence was disregarded on redetermination, there is no remaining medical evidence in the record of radiating pain, of motor loss, or of atrophy. Dr. Urquia's 2008 progress notes indicate Picon's back pain was intermittent, that he had full movement of his lower back, and that his impairment improved with activity and with physical therapy. Picon, throughout the closed period, went to the grocery store, walked, and drove a car. He relied on a cane for support but nothing more. Picon acknowledged some balance difficulties with getting into and exiting his shower but, again, nothing so severe as what Listing 1.04A requires. The ALJ noted this disparity and reasonably found that the disability determination depended not only on Picon's

MRIs, which demonstrated a spinal impairment, but on Dr. Hernandez's testimony, which raised that impairment to the level of a severe disability.

The ALJ proceeded to consider whether Picon might still be disabled pursuant to listings for other forms of spinal disorder. Each, however, required something more than the medical record here supports. *See* Tr. 22–23; *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 1.04B, 1.04C. For the same reason, Picon's obesity did not compel a finding of disability. An obese individual qualifies as disabled only when an impairment in combination with obesity meets the requirements of a listing. Tr. 21 (citing SSR 02-1p). The ALJ found Picon capable of continuing to work as a procurement services manager, the job he held before he asked for a re-assignment. Tr. 26. The finding accounts for Picon's sedentary, skilled work RFC as well as his "advanced age" at the time of the initial disability determination. *See* 20 C.F.R. § 404.1563(e) (applying special rules to claimants aged sixty or older); Tr. 61–62. In the absence of evidence from Dr. Hernandez, substantial evidence supports the ALJ's considered analysis and conclusion that Picon was not disabled within the meaning of the Social Security Act.

Because the ALJ was correct, then the court must address Picon's Due Process argument. If there were not substantial evidence, then the court could avoid reaching the constitutional question. *See DeBartolo Corp.*, 485 U.S. at 575.

*Due Process*

Picon devoted his memorandum of law and reply to the procedures applied in redetermination cases. *See generally* Dkt. 21; Dkt. 23. The arguments Picon raises regarding his Fifth Amendment rights, the supremacy of a reason to believe in similar fault finding, and the disregard of evidence without permitting a challenge, are all questions faced by courts around the country. Picon presents two, intertwined due process issues: (1) the application of the similar fault finding to Picon's case and (2) the exclusion of evidence resulting from the similar fault finding and the closed period restrictions.

If there is reason to believe fraud or similar fault was involved in a beneficiary's claim for disability insurance, the Commissioner must redetermine benefits and, in that redetermination

process, disregard any evidence for which there is reason to believe fraud or similar fault was involved in its provision. 42 U.S.C. §§ 405(u)(1)(A)–(B).

The SSA contends that Dr. Hernandez and Torres's respective plea agreements "reflect a similar independent determination that there existed a 'reason to believe' that fraud was involved in applications (including the Plaintiff's) containing evidence from these sources" as in *Robertson*. Dkt. 22 at 14 (citing *Robertson v. Berryhill*, Civil No. 16-3846, 2017 WL 1170873 (S.D. W.Va. March 28, 2017)). The SSA also cites a nearly one-hundred-page OIG referral letter, a significant portion of which contains documents and evidence unrelated to Picon and the doctors he saw. *See* Ex. 15B. Torres pleaded guilty to making false statements to the SSA for use in determining the disability insurance benefits for two claimants, who were both in good health and working with law enforcement. Tr. 741–50. Dr. Hernandez pleaded guilty to similar fraud charges, and he confessed to referring patients to medical specialists, such as psychiatrists, who did not need such referral. Tr. 723–731. Picon saw neither of those named psychiatrists. Tr. 731.

Because the OIG conducted the subsequent investigation into cases in which Torres, Dr. Hernandez, and others were involved, Picon could not challenge the determination that fraud or similar fault was involved in his application for benefits. *See* 42 U.S.C. § 405(u)(2); SSR 16-1p, 2016 WL 931538 (March 14, 2016); HALLEX I-1-3-25(C)(4)(a) ("adjudicators do not have discretion to reconsider the issue of whether the identified evidence should be disregarded when based on an OIG referral of information."). Had the SSA conducted the investigation into Torres, Dr. Hernandez and the others, then the adjudicator would have retained discretion to consider or disregard the allegedly fraudulent evidence. HALLEX I-1-3-25(C)(4)(a). Here, the SSA initially received tips about suspicious activity in Puerto Rico disability insurance claims and referred the information to the OIG for investigation, thus guaranteeing any redeterminations would be subject to the stricter evidentiary standards and precluding ALJ's discretion. *See* Barry Decl. ¶ 2. The SSA contends that Picon's arguments that he should be able to challenge the assumption of similar fault in his case or the significance of the plea agreements, which were included in the case record reviewed by the ALJ, are "without merit." Dkt. 22 at 15. It might be more accurate to state that

Picon's contentions lack statutory support—the Sixth Circuit in *Hicks* held that the different treatment of OIG referrals of information and SSA referrals indeed violated due process. *Hicks*, 909 F.3d at 801.

The government contends that because the statute requires only a reason to believe fraud occurred rather than a finding of fraud, there has been no due process violation. Because the plea agreements were independent proceedings separate from Picon's entitlement to benefits, the government argues, Picon's inability to rebut their significance is irrelevant to his due process rights. Dkt. 22 at 20. The inability to challenge those findings, however, effectively imposes their stain upon a claimant. The record before this court includes Dr. Hernandez-Gonzalez and Torres's plea agreements and materials relating to their fellow indicted conspirators under the entry "jurisdictional document," but none of it mentions Picon. Tr. 649–751. Jurisdiction could be made clear in either a short statement about Dr. Hernandez-Gonzalez and Torres or in a more relevant document demonstrating why the SSA referred Picon's case specifically for redetermination.

Picon could not challenge the determination that fraud or similar fault was involved in his application for benefits. *See* 42 U.S.C. § 405(u)(2); SSR 16-1p; HALLEX I-1-3-25(C)(4)(a) ("adjudicators do not have discretion to reconsider the issue of whether the identified evidence should be disregarded when based on an OIG referral of information."). This limitation caused more than just a procedural impact on his claim. The inclusion of the jurisdictional document in his transcript lends an incriminating gloss to the documents that a neutral, factual statement of redetermination would not. It associates him with Dr. Hernandez-Gonzalez and Torres's crimes in such a way that he cannot extricate himself.

The Court observed that evaluating fault "usually requires an assessment of the recipient's credibility, and written submissions are a particularly inappropriate way to distinguish a genuine hard luck story from a fabricated tall tale." *Califano v. Yamasaki*, 442 U.S. 682, 697 (1979). The *Califano* court, ruling on termination of welfare benefits, did not see how the pertinent circumstances on which finding fault relies, including a beneficiary's physical condition, mental condition, and good faith, "can be evaluated absent personal contact between the recipient and the

person who decides his case." *Id.* A one-sided credibility determination judges and, in some cases, punishes a person on papers over which he or she lacked control rather than by their acts or intent, which are more traditional metrics in our legal system. Adherence to procedure in this case leads to the same consequence: the SSA attributes beneficiaries unknowing or innocent of fraudulent, third-party conduct with that criminal act without an opportunity to challenge that determination. *Hicks*, 909 F.3d at 803.

Picon further argues that the limitations on admissible evidence and application of a closed period further impeded the presentation of his case during redetermination. Dkt. 21 at 15–18. Had the SSA conducted the investigation into Dr. Hernandez-Gonzalez, Torres, and the others, then the adjudicator would have retained discretion to consider or disregard the allegedly fraudulent evidence. HALLEX I-1-3-25(C)(4)(a). Here, the SSA initially received tips about suspicious activity in Puerto Rico disability insurance claims and referred the information to the OIG for investigation, thus guaranteeing any redeterminations would be subject to the stricter evidentiary standards and precluding ALJ's discretion. *See* Barry Decl. ¶ 2.

Picon raises specific concerns that application of the closed period violates the Due Process Clause. Dkt. 21 at 15–18. The SSA did not respond to the closed period argument. *See generally*, Dkt. 22. The closed period excludes evidence from prior to the disability onset date and from after the award of benefits. *See* HALLEX at I-1-3-25(C)(3). The Commissioner issued a policy interpretation ruling essentially restating that closed period limitation on evidence. SSR 16-1p, 2016 WL 931538; *see also* Titles II and XVI: Fraud and Similar Fault Redeterminations Under Sections 205(U) and 1631(E)(7) of the Social Security Act, 81 Fed. Reg. 13436 (March 14, 2016). Picon argues that the only legally relevant period is the date through which the claimant was last insured for disability benefits ("Date Last Insured" or "DLI"). "To establish a period of disability, you must have disability insured status in the quarter in which you become disabled or in a later quarter in which you are disabled." 20 CFR § 404.131; *see also* 42 U.S.C. §§ 423(a), (c)(1). A qualifying DLI, therefore, is necessary for a person to be entitled to disability insurance benefits

from the SSA. Picon argues, unopposed, that using the closed period rather than the DLI penalizes beneficiaries in redetermination cases.

Picon's objections are far from unique. The Sixth Circuit recently found due process violations in eleven, consolidated redetermination cases. *Hicks*, 909 F.3d 786. A vigorous dissent, however, reflects both the SSA's position, *see* Dkt. 22, and the position of district courts in the Fourth and Eleventh Circuits. *See, e.g., Robertson*, 2017 WL 1170873; *Roberts v. Commissioner*, Civil No. 17-565, 2017 WL 5712895 (M.D. Fla. Oct. 27, 2017). Other district courts in the Fourth and Seventh Circuits, writing after *Hicks*, found the Sixth Circuit opinion persuasive and reached the same conclusion. *Tyler J. v. Saul*, Civil No. 17-50090, 2019 WL 3716817, at *4–8 (N.D. Ill. Aug. 7, 2019); *Kirk v. Berryhill*, Civil No. 17-2189, 2019 WL 2950022, at *7–8 (D.S.C. July 9, 2019). The First Circuit faced a similar question but resolved the matter on threshold, procedural grounds before it could reach the due process issue. *Justiniano v. SSA*, 876 F.3d 14, 27–28 (1st Cir. 2017).

The Supreme Court set forth a balancing test in *Mathews v. Eldridge* to determine the contours of due process in different types of adjudication. *Mathews v. Eldridge*, 424 U.S. 319 (1976). To evaluate the procedural safeguards the Constitution requires in a given scenario, a court must weigh three distinct factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335. The courts in *Hicks*, *Kirk*, *Roberts*, and *Robertson* each applied the *Mathews* balancing test to review Social Security disability insurance redeterminations challenged by the plaintiff.[4]

---

[4] While these cases each applied *Mathews*, it bears noting that the Sixth Circuit in *Hicks* also applied a minimum due process analysis. *Hicks*, 909 F.3d at 797. The court explained its decision as reflecting that procedural due process in the redetermination context required, "at a minimum, 'a fair opportunity to rebut the Government's factual assertions'" whereas *Mathews* better applies to cases determining whether additional process is due. *Id. Hicks* ultimately found that petitioners prevailed under the minimum due

Notably, each of those redeterminations involved attorney Eric Conn and ALJ David B. Daugherty, both of whom pleaded guilty to a scheme to defraud the SSA through falsified medical documents in disability insurance claims. *Hicks*, 909 F.3d at 791–92, 797–805 (finding due process violations); *Kirk*, 2019 WL 2950022, at *2 (finding due process violations); *Robertson*, 2017 WL 1170873, at *1, *6–14 (finding no due process violations); *Roberts*, 2017 WL 5712895, at *1 (finding no due process violations). *Robertson* is one of three cases in which a district court in the Fourth Circuit found no due process violation, yet *Kirk* diverged and cited *Hicks* favorably. *See Kirk*, 2019 WL 2950022; *Taylor v. Berryhill*, Civil No. 16-0044, 2018 WL 1003755 (W.D. Va. Feb. 21, 2018); *Dillon v. Berryhill*, Civil No. 16-4330, 2017 WL 1170869 (S.D. W. Va. March 28, 2017); Both *Roberts* and another case from the Middle District of Florida follow *Robertson* and arrive at the same conclusion. *See Roberts*, 2017 WL 5712895, at *4–7, *10–11; *Smith v. Comm'r of Soc. Sec.*, Civil No. 17-1084, 2017 WL 5256872, at *4, *6, *8 (M.D. Fla. Nov. 13, 2017). The First Circuit, in contrast, favorably cited a lower court case affirmed in *Hicks* when it observed that the plaintiffs in *Justiniano* showed "at least a colorable claim of ultimate success on the merits." *Justiniano*, 876 F.3d at 28 (citing *Hicks v. Colvin*, 214 F. Supp. 3d 627, 633–46 (E.D. Ky. 2016) *aff'd sub nom Hicks v. Commissioner*, 909 F.3d 786).

    *Mathews* ultimately held that the SSA process for terminating disability benefits, the issue being dealt with here, satisfied due process requirements in part because a beneficiary had the opportunity "to submit additional evidence or arguments, enabling him *to challenge directly the accuracy of information* in his file as well as *the correctness of the agency's tentative conclusions*." *Mathews*, 424 U.S. at 346 (emphasis added). The *Mathews* factors weigh as follows.

    As to the first factor, Picon, like all Social Security disability beneficiaries, has a substantial interest in receiving those benefits, and erroneous termination can cause significant hardship. *See, e.g.*, *Mathews*, 424 U.S. at 342; *Robertson*, 2017 WL 1170873, at *6. To his detriment, Picon did not offer any examples of how significant the loss of his monthly $2,299.00 benefit was, but it can

---

process test as well as under *Mathews*. *Id.* I apply *Mathews* as the stricter of the two tests and because both parties considered it the appropriate method.

be assumed that the monetary loss affects his ability to provide for himself and for his family. *See* Tr. 598; *see generally* Dkt. 21, 23. Moreover, there may be a loss of dignity when the government terminates disability benefits on the basis of fraud or similar fault involved in an application. The Sixth Circuit in *Hicks* remarked on the unchallengeable association between an innocent beneficiary and a criminal act. *Hicks*, 909 F.3d at 803. Such an association threatens a beneficiary's dignity, and the inability to challenge the government's declaration that there is "reason to believe" the beneficiary was involved in fraud can damage a person's sense of self-worth and reputation in the community.

Turning to the second *Mathews* factor, the SSA contends that safeguards already in place temper the risk of erroneous deprivation. Dkt. 22. at 16–20. As a preliminary matter, the SSA points out that a new application for disability insurance benefits may be submitted at any time, even during the redetermination process. Dkt. 22 at 16; *see also* HALLEX I-1-3-25(C)(4)(c). Reviewing a disability benefits application, of course, indicates the extent of filing anew. Transcripts in these cases may run to a thousand pages or more, and claimants must fill out forms detailing every aspect of their claimed disability, not to mention track down, obtain, and turn over medical records from their own doctors and submit themselves to examinations with SSA physicians. Restarting the process is not so much a safeguard against erroneous deprivation of benefits as it is a surrender.

The SSA next suggests that the loss of benefits may be a less significant hardship than it appears because terminated beneficiaries may obtain waivers of overpayment. Dkt. 22 at 17. When an ALJ determines that a beneficiary was not disabled during the disability period, the SSA may send a demand letter seeking repayment of the amount distributed to that beneficiary. *See* 42 U.S.C. § 404(a)(1)(A). The SSA correctly notes that beneficiaries may seek a disability insurance waiver to avoid repayment of benefits later deemed to be overpayments. 42 U.S.C. § 404(b)(1) ("there shall be no adjustment of payments to, or recovery by the United States from, any person who is without fault if such adjustment or recovery . . . would be against equity and good conscience."). Waiver, however, is not guaranteed. In the cases consolidated in *Hicks*, the SSA declined to offer

blanket amnesty to plaintiffs. *Hicks*, 909 F.3d at 802. The statute requires that so-called overpayments be waived for "any person who is without fault." 42 U.S.C. § 404(b)(1). For waiver to be an adequate safeguard, then, additional evidentiary hearings would have to be held to determine fault. The SSA does not reconcile this position apparently supporting individualized findings of fact with their resistance to holding evidentiary hearings prior to termination on the question of fault.

The SSA also points to three safeguards that already protect beneficiaries in the redetermination process: they can submit additional evidence during the ten-day period and prior to a hearing before an ALJ; the ALJ is impartial; and a hearing on the evidence occurs. Dkt. 22 at 17–20. Picon objects that ten days is not sufficient time in which to submit additional medical records; compelling as that is, beneficiaries may appeal the redetermination to an ALJ, which gives them a more suitable amount of time to gather and submit additional evidence. *See* Dkt. 23 at 7. The ability to submit additional evidence is a strong safeguard, though it is not a panacea for disregarded evidence. Asking plaintiffs to gather medical records from years or decades prior is burdensome. Physicians may have destroyed records, and plaintiffs may have foregone second opinions due to trust in their primary physician. *Kirk*, 2019 WL 2950022, at *9; *Robertson*, 2017 WL 1170873, at *7. The SSA contends that it may help obtain new evidence, but this is limited in several ways. Dkt. 22 at 18. First, such help is only granted when "requested and appropriate." *Id.* The SSA provides aid when "[m]edical or vocational expert advice is needed," but the guidelines imply that having medical evidence completely disregarded does not equate to a need for additional expert advice. *See* HALLEX I-1-3-25(C)(4)(b). Indeed, the SSA limits when it is willing to develop evidence in redeterminations based on fraud or similar fault to "[e]vidence that is new, material, and related to the period at issue" and either incomplete or where "the record does not show that SSA previously made every reasonable effort to develop the same evidence." *Id.* An adjudicator may also request development of new sources of information. This may reduce the risk of erroneous deprivation, but its discretionary nature diminishes its potential impact.

*Hicks* and *Robertson* identify a greater risk: exclusion of suspect medical evidence. *See Hicks*, 909 F.3d at 801; *Robertson*, 2017 WL 1170873, at *7. Supreme Court precedent indicates that the risk of erroneous deprivation is "unacceptably high" when the plaintiff is denied notice of the SSA's factual assertions and "a fair opportunity to rebut those assertions before a neutral decisionmaker." *Hamdi v. Rumsfeld*, 542 U.S. 507, 533. Here, the SSA denied Picon the former, which hindered his ability to take advantage of the latter. Exclusion presents a multifaceted due process problem. Plaintiffs do not receive notice of the factual determinations detailing the reason to believe fraud or similar fault was involved in their application, large amounts of evidence may be excluded when only small portions likely qualify for exclusion, and OIG and SSA investigation findings are treated differently.

As the Sixth Circuit found in *Hicks*, I conclude that "the risk of an erroneous deprivation under the SSA's current framework is too high." *Hicks*, 909 F.3d at 800. The opportunity to attack the redetermination finding is not equivalent to the ability to attack the determination that similar fault or fraud was involved in an application and explicit instructions to disregard evidence. Because plaintiffs lack access to the factual determinations, they cannot challenge the amount or type of evidence disregarded. Nor can ALJs, because OIG investigation findings are rendered conclusive by the law. *See* 42 U.S.C. § 405(u)(2). This would resolve the issue spotted in *Hicks*, where the OIG knew that only a small portion of each physician's report was fraudulently prepared, but the SSA disregarded any evidence signed by those physicians, including materials for which there was no claimed reason to believe fraud or similar fault was involved. *Hicks*, 909 F.3d at 801. This tangle of deference to the OIG findings heightens the risk of erroneous deprivation to an untenable level. The impartial ALJ and the existence of a hearing at which the plaintiff may testify could be powerful safeguards, but when the ALJ lacks discretion and the evidence presented and heard comes pre-censored, a high risk of deprivation remains. Moreover, a grant of discretion to ALJs reviewing redeterminations based on OIG investigations should not be burdensome because they already apply discretion in the case of SSA investigations.

As to the final *Mathews* factor*,* the SSA has a strong interest in reducing costs and maintaining efficiency. The Social Security Act requires the SSA to "immediately redetermine" benefits where there is "reason to believe fraud or similar fault was involved in the application." 42 U.S.C. § 405(u)(1)(A). Additional hearings in which plaintiffs could challenge the OIG finding would take time, thus delaying the redetermination process. The *Robertson* court called this delay "[t]he greatest detriment to the SSA" in requiring such hearings. *Robertson*, 2017 WL 1170873, at *10. Hearings could increase the cost of the redetermination process, though it is likely that ALJs review most redeterminations because former beneficiaries challenge their terminations if able. The Sixth Circuit observed that requiring ALJs to review the sufficiency and merits of the OIG investigations would be a great burden in addition to potentially infringing on law enforcement efforts, and the SSA makes the same argument here. *See Hicks*, 909 F.3d at 803; Dkt. 22 at 20. It is unclear, however, why an ALJ would be unable to review OIG evidence in addition to the complex and lengthy records they already endure. The burden additional records create is more likely borne by OIG investigators, who would have to be more detailed in explaining why there is "reason to believe fraud or similar fault" was involved in any individual beneficiary's application in order for ALJs to have sufficient information to review those findings. Picon's case was one of 7,000 reviewed by the SSA. Barry Decl. ¶ 5. Such review would not so much infringe on law enforcement investigations as demand a level detail and proof from investigators commensurate with the consequences of their findings. Furthermore, the SSA already has to offer that level of proof because its investigators are not afforded the same level of deference as OIG's. If the SSA can rise to meet a burden of thoroughness and factual support, so must the OIG.

The SSA also contends that requiring specific findings in every redetermination would infringe on the authority of the Department of Justice or the OIG "to identify and prosecute program fraud and render findings that can themselves serve as the basis for redeterminations." Dkt. 22 at 21 (citing *Robertson*, 2017 WL 1170873, at *5). Requiring specific findings certainly would be an additional responsibility, but placing OIG investigations on a level with SSA investigations, for example, does not strip away authority to investigate or to prosecute.

Like the *Robertson* court, I am not persuaded that the potential for different outcomes in redeterminations should tip the balancing test. *See Robertson*, 2017 WL 1170873, at *9. It stands to reason that different beneficiaries with different disabilities and different relationships to the third parties guilty of fraud might have disparate results in the redetermination process. Disparate outcomes reflect the integrity in the Social Security program as a whole. The SSA has a powerful interest in maintaining respect for its institutions, especially those that depend on taxpayer funding. Widespread belief in Social Security disability insurance fraud weakens the institution and may even negatively affect legitimate recipients. Prosecuting fraudulent activity and policing applications to restrict benefits to those qualified are both vital to the administration of benefits.

On balance, the *Mathews* factors favor Picon and other plaintiffs whose disability insurance benefits were terminated after this particular OIG investigation led to redeterminations. The administrative burden on the SSA cannot stand up to the risks of erroneous deprivation. Without review or the opportunity to challenge the finding of fraud or similar fault, the statute breaks with *Mathews*. It denies plaintiffs whose benefits are terminated an adequate opportunity to challenge the OIG investigation and the application of those investigations' findings to their individual medical records. Where the government seriously injures an individual based on its factual findings, the individual must be given both access to those facts and the opportunity to prove them untrue. *Greene v. McElroy*, 360 U.S. 474, 496 (1959). This Supreme Court calls this opportunity "immutable in our jurisprudence." *Id.*

As the district court in *Hicks* observed, social security redeterminations are somewhat of an outlier in due process cases. *See Hicks v. Colvin*, 214 F. Supp. 3d at 630 (noting that the opportunity to challenge the facts against them before a neutral arbiter is afforded to: suspected Al Qaeda operatives, employees fired for lying on employment forms, and persons subject to a seizure of goods pursuant to a writ of replevin). The OIG finding, in contrast, is treated as determinative; there is no provision for claimants to prove that, in their case, reports were neither exaggerated nor fraudulent. The SSA contends that this procedure satisfies due process because claimants may file new benefits applications and the temporary loss of benefits does not outweigh the burdens of

additional procedure to the already years-long process. Dkt. 22 at 16, 18–22. A chance to start over cannot erase loss caused by the violation of one's constitutional rights. Picon's claim for disability insurance benefits was deemed fraudulent without the opportunity for him to rebut that assertion. Similarly, disregarding evidence absent a direct showing that the evidence has been tainted by fraud denies disability insurance beneficiaries a fair opportunity to make their case. Such treatment violates the Due Process Clause of the Fifth Amendment.

## CONCLUSION

The Due Process clause requires the SSA to give beneficiaries in redetermination cases the opportunity to challenge the application of fraud and similar fault to their cases and the consequent disregard of entire medical reports. Because the plaintiff was denied the opportunity to show why his medical reports were not tainted by fraud, this case is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings consistent with this ruling. Should Picon so request, his benefits may be reinstated pending the Commissioner's decision on remand.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 4th day of September, 2019.

*S/Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge